Good morning, ladies and gentlemen. Our first case for this morning will be R3 Composites Corporation v. G&S Sales Corp. 19-2290. Mr. Guillory. Your Honor, may it please the Court. Randall J. Guillory appearing on behalf of the appellant, G&S Sales Corp. So this is the appeal by G&S Sales Corp. of the summary disposition opinions and orders at the district court level granting summary judgment in favor of R3 Composites and dismissing the counterclaim for unpaid sales commissions and for violation of the Indiana Sales Commission Act. So the case turns on whether there is a genuine issue of material fact as to whether there was an enforceable agreement between the parties. And we believe clearly there is a genuine issue of material fact. So in this case, both of the parties acted over the course of approximately five years as though there was a binding and enforceable agreement between them. Can I ask you this? Your opponent emphasizes that through interrogatories and through other representations to the court, I'm going to put words in their mouth. You boxed yourself into a corner by saying that the only source of any agreement was this nondisclosure agreement. And then they zero in on the language in paragraph 12 saying the parties will attempt to develop an agreement. So if they're right, I mean, that's not the language of agreement. That's the language of we'd like to negotiate with each other. But I'd like you to address your own approach to this litigation and why we should take a broader view in your opinion. Okay. So to address your first point, we believe that the agreements that they in fact did enter into on the commission rates were a part of the nondisclosure agreement because the nondisclosure agreement, and I agree, at the time the nondisclosure agreement was signed, it was an unenforceable contract. It was an agreement to agree well and in law. As to commissions only. It was enforceable as to lots of other things, right? There were quite a few things. The nondisclosures, the nonsolicitations, there was a lot in there, right? I would agree with that, yes. So you've got an agreement, but you're saying the subsequent agreements on the commissions were in essence part of that larger agreement. Yes. And there really was never any dispute that the parties agreed upon the commission rates on a job-by-job basis as required by the contract. In paragraph 15 of the complaint for declaratory judgment filed by R3 when they initiated this case, they specifically alleged in paragraph 15 that the parties agreed on a job-by-job basis as to the commission rates. And we admitted that. So it was stipulated in the pleadings very early on that the defect in the nondisclosure agreement as to the payment of commissions was fixed. The parties stipulated to that there was never an issue in the case as to whether the parties agreed to the commission rates. As a matter of fact, a major part of the motion for summary judgment by R3 was that Mark Liddon had the authority to change the commission rates from what was agreed upon, 3% for aquatic and 5% for Janesville and Trivector. And just to clarify that or nail it down, this appeal, I understand, is only about these particular named accounts, the aquatic account and the Trivector and whatever. There seems to me there are about six or so of them. That's correct. That's the vast majority of all the business. The biggest part of it is... So you're not claiming any kind of agreement for somebody who's not named? No. Okay. So when this case was originally filed, what the issues were. And, again, in the declaratory judgment count or complaint, there was never any claim or request that the court find that the agreement was unenforceable. If you look at the wherefore clause in count one of the complaint, it basically states that they're asking the court to find that the agreement is a valid and enforceable contract. So they were never disputing that the contract was valid and enforceable. What the case really was about, and even in count two where they talk about implied contract, what they're asking the court to do is find that even if there was an implied contract, they don't have to pay any more sales commissions. So the real issue in the case, there were two key issues in the case. Number one, is there any liability of R3 Composites to continue to pay sales commissions after they terminate the contract? And that turns on paragraph 12 of the nondisclosure agreement, which basically requires them to pay commissions on any extensions, renewals, subsequent phases, or additional terms of any job obtained by my client. So, effectively, what happened in this case? Is it correct that after the 2015 formal termination of the NDA, R3 continued to pay commissions? Absolutely. Under the provision about, in essence, extensions, renewals, et cetera. Absolutely correct. For about a year and change? They eventually stopped, but for some period of time. Correct. Almost a year. And so their big argument is we shouldn't have to pay sales commissions anymore. And basically the position that they were taking was that even though Aquatic, which is the largest account, keeps ordering the same parts over and over again, they're saying each new purchase order that comes in, that's a new job, and we have to negotiate the commission rate on each new purchase order that comes in. But the reality is those are extensions, renewals, or subsequent phases of parts that have been made for five years and are continuing to be made. So that's what they were trying to get out of was the responsibility to pay continuing commissions. And the other big issue was we determined during discovery that they had lied about the sales numbers. That on the Trivector and Janesville accounts, what they did is they picked a sales number, a commission number, that they wanted to pay. Yeah, there was this manipulation. Doesn't this all flow from Glidden's dual role here, though, which you knew about? Both parties knew about it. And it was actually done as a favor to Mr. Carver because he had nobody that knew how to run his business. And Mr. Glidden had some experience in that. He was actually a partner of my client. My client brought in all the business that got that company started. And Glidden was the only person who really knew how to run it. So it was a favor to Mr. Carver that that arrangement was made. But then, at least to read your brief, it appears that Mr. Glidden's loyalties shifted over to R3. Absolutely. Because he knew that's where his long-term relationship was going to be. Mr. Kaleri? Yes. I understand your arguments about you don't think that your theory is a surprise to R3 based on what they said in the district court. I'd like to go back to Chief Judge Wood's initial questions about and ask you, where did you most clearly disclose in the district court your theory that, in essence, that you had this NDA agreement in place and that the subsequent agreements, account by account, were a part of that larger agreement? Well, it's a difficult question to answer because, basically, that would be disclosed in the briefs. In the summary judgment briefs. In the summary judgment briefs. Our counter complaint alleged a violation of the nondisclosure agreement. Their complaint alleged that the parties agreed to the commissions on a job-by-job basis, which we admitted to. So that was a stipulated fact. So there was never any dispute in any of the briefs that were filed that the parties agreed upon the commission rates on the aquatic and the Janesville and tri-vector jobs. And so your position also has to be that, under the law of Indiana, there's nothing impermissibly vague about a contract that says we're going to agree on commission rates job-by-job. As long as they go ahead and agree on those commission rates job-by-job, which is what they did in this case. So that's a course of dealing argument? Well, it's a course of dealing, course of performance. Indiana law says you can take the written agreement and you can supplement it with the oral agreement entered into in the course of performance by the parties to make one complete agreement. One other key point about Indiana law. Effectively, what has happened in this case is that the district court allowed our three composites to violate the Indiana Sales Commission Act, which is a statement of the public policy of the state of Indiana that you have to pay sales commissions in the event of a termination to a sales representative within 15 days of the date those commissions are due. And if there's a bad faith failure to pay, then you violated the Indiana Sales Commission Act. The district court totally let them off the hook for that. Well, that presumes an enforceable agreement to pay commissions. Your argument ignores the language of the NDA that says the parties will attempt to develop an agreement to pay commissions on a job-by-job basis. It doesn't say the parties agree to pay commissions on a job-by-job basis, with the 5% being the benchmark. It says we'll attempt to develop an agreement. That's an agreement to agree. It is until they actually agreed upon the commissions on a job-by-job basis. And actually what it says in the Indiana Sales Commission Act, it says if there's commissions that were due as of the date of termination, and these are the underpaid commissions that they basically, when they cheated about the sales numbers, that's where the bulk of those dollars are. There was never any dispute as to what the commission rate was. And so at that point in time. So those were supported by independent purchase orders or documents of some type? Commission payments. They paid commissions for five years at the agreed-upon commission rates. And as a matter of fact, at the district. The documentation when, say, Aquatic sent something for fabrication, there must have been some documentation. Well, basically the way that worked, they would send us the sales numbers, and then we would take those sales numbers and send an invoice based upon the sales numbers that they provided. And even at the district court level, in the first decision, the court said there's a fact issue on whether they violated the Indiana Sales Commission Act. There's a fact issue as to whether or not Mark Liddon had the apparent or actual authority to change the commission rates. So is there any hint, to pick up a little bit on what Judge Sykes is saying, that the Sales Commission Act claim was based on, I'll just say, a broader agreement than just the language that appears in paragraph or Part 12 of the nondisclosure agreement? It's based upon the agreement to pay commissions on the business that my client obtained for them, which was what was alleged. Which was complied with, you're saying. You're saying there's at least circumstantial evidence that there was such an agreement because it happened. Five years of experience. Well, that's an implied contract theory. That's not an express contract theory. So you're not relying on the NDA. You're relying on a contract implied by course of conduct. The testimony was that they expressly agreed. Mr. Stephanie said. Whether there's an express contract depends on what's in the document. And the document is an agreement to agree. That's unenforceable under Indiana law. So take that out of the equation. What's important is the course of conduct. But that's just an implied contract theory, which you didn't advance until your motion to amend and motion for reconsideration. Because it was never an issue prior to that time. Is it correct that Indiana law allows agreements to be partly in writing and partly oral? Absolutely correct. And that's the way this worked from your point of view, right?  I have about two minutes left, ma'am. You certainly may reserve that.  Mr. Hike. Thank you, Your Honors. May it please the Court. This case is not about subsequent agreements. It's not about oral agreements. It's not about course of conduct. It's not about implied agreements. And it's not about those things because GNS never made it about those things. The complaint that GNS filed, and it's a counter-complaint, what they filed was a counter-complaint that was based entirely upon the nondisclosure agreement. But isn't it when we look at the fact, for example, that they're talking about five years' worth of payment, it seems to me, unless you're really practically common law, zealot about the pleadings, that they are making the kind of argument that Judge Hamilton just referred to, that there's the beginning and the written agreement. Obviously the integration clause can only cover what's happened up until that time. And it's supplemented by oral agreements, which themselves are carried into effect, and you can see that by the course of conduct. So there's two responses to that. One, with respect to the complaint, it's been made very clear throughout this, and GNS has actually admitted this, that's in the record at document 65, page 6, that the NDA spoke only, or the counter-complaint spoke only to the NDA, not an oral agreement, not an implied agreement, not a course of conduct. Are you paraphrasing or are you reading? With respect to doc 65, page 6, that's in a brief that they filed. It's in the reply brief, I believe. I apologize. It's at the district court. That's the admission that they make there. They also admit it with their motion for leave in that, and that's a tacit admission. That's not an express admission in the motion for leave. But I guess what worries me is that, of course, if you phrase it the way you just did, they're dead in the water because, as Judge Sykes said, an agreement to agree is not an agreement. Sounds like a word game. But if, in fact, you can look at the way they've litigated the case and they're bringing in all sorts of information about the course of dealing and about the fact that the agreement is to pay a commission rate, negotiate on a job-by-job basis, that's different. That's what they did. That's what happened. And so that is part of the ultimate agreement that led to these six or seven accounts. So here's how they've litigated the case. They responded in an answer with respect to the two counts that R3 had set forth. And how clearly did R3 tell the district court that it was relying on the Indiana doctrine about agreements to agree? It seems like that came rather late in the day for you, too. It was not an affirmative defense that we set forth. We did argue in response to the counterclaims. So if we're going to forgive your evolution, then why not theirs? I'd say two things to that. One, we did raise the prospect of it right out of the gate that the NDA may not be enforceable. But you weren't specific at all about that. We did not take a direct position that the NDA was not enforceable. How is a district court supposed to know what theory you're relying on for that? Well, with respect to count one, we were clear that we were seeking a declaration under the NDA we owed no further commissions. With respect to count two. Exactly. But there are lots of ways a contract might not be enforceable. The person who signed it might not have had authority to sign. There might be an agency problem. There might be an agreement to agree problem. There might be a lack of consideration. So how clearly did you alert the district court at the beginning that you were making an argument based on the language attempt to develop an agreement? We didn't set that forth in our initial complaint. It wasn't in your motion for summary judgment, was it? Because you, in the motion for summary judgment, didn't signal that you thought the NDA had this agreement to agree in paragraph 12 and therefore we win, right? The motion for summary judgment, when we set forth there, there were multiple arguments because the entire focus. Did you set forth the argument I just articulated? The NDA is in agreement to agree in paragraph 12, therefore we win the whole case. We did not set forth that exact argument, no. So, no. So, I mean, that's something that obviously has kind of emerged as the evidence and the theories have been tried out. Can I ask you if GNS had sued you in Michigan or in St. Joe County, would you have had a venue defense? I believe we potentially would have, yes. Under the NDA? Possibly, maybe, yes. And that's only if the NDA is in place and enforceable, correct? With respect to certain provisions, and then there's a severability clause, I believe, as well, Judge. But you've got a venue provision, the choice of law provision. The NDA is enforceable, at least in part, right? Certain parts, yes. Yeah, okay. And so I guess the trouble, one of the troubles that I have is your client went to the trouble of formally terminating the NDA in 2015, and then continued to pay commissions under its terms for a year after termination. In essence, complying with, a jury might reasonably infer, the NDA as supplemented by these account-by-account agreements. What's unreasonable about that inference? One, any continuing obligation doesn't necessarily, or any continued payment of commission doesn't necessarily mean it was paid pursuant to the NDA. What was it paid pursuant to? Well, as GNS has argued, there were other commission agreements. You had purchase orders that would come in. GNS would solicit those purchase orders. Under what agreements were continuing commission payments required after the termination of the NDA? Factually, the evidence that was before the court was that Mark Glidden had continued to operate in his dual role, and so the commission payments didn't continue under the NDA. The commission payments continued because Mark Glidden, on behalf of GNS, continued to solicit orders and bring orders in, and there were oral agreements and or the conduct of the parties that may have led to the obligation. That sounds very messy, as you describe it. Sounds like a jury argument. Yeah, it sounds very messy. Doesn't this relate back to the procedural argument on which the second district court decision largely rested, which is that Indiana law says that an agreement whose terms are partly written and partly oral is considered a wholly oral contract. That's correct. And there was no oral contract claim anywhere in this case, and the deadline for amending pleadings to rely on an oral contract had long since passed, and that's what I understand the second decision to largely rest on. That would be correct. So after the first motion, the order that Judge Springman entered, GNS filed a motion for reconsideration, R3 filed a request, and GNS also filed a motion for leave to amend. It was for the first time in that motion for leave to amend, only after the court had found that the NDA was illusory and unenforceable, that GNS advanced theories and attempted to advance theories based upon oral contract or an implied contract, whether that be implied in fact or implied in law. So an oral contract is not the same thing as an implied contract. Correct. An oral contract is an actual agreement that the parties don't reduce to writing. That's correct. An implied contract is a legal construct. Mr. Hike, is a complaint for breach of contract required to specify whether the contract is written, oral, or mixed? Whether it's required to or not, GNS committed itself to a position as to what contract it was relying upon, and that was the NDA. And we asked them in discovery, and there's a purpose of discovery, of course, to ask if there are any other agreements that you're relying upon. And in response, we asked if GNS entered into any or entered into an agreement with R3 other than the NDA, please state whether the agreement was oral or written, when the agreement was entered into, and the place of making the agreement, the duties of each party under the agreement, the name, address, telephone number, and job title of each person present at the time the agreement was entered into. GNS responded very clearly, defendant is not aware of any other agreements at this time. But see, the reason that ship's passing in the night is their concept of what the NDA itself encompasses, is one that includes the performance under the NDA. It's showing what the parties meant by saying job by job basis. And your concept of the NDA does not include that later elaboration. Their concept of the NDA is that. And there's an awful lot of discovery that went on on both sides dealing with what that course of conduct was. Why didn't you just object that it was all irrelevant? As to course of conduct, et cetera? Yeah. I don't know. As far as discovery? Yeah, in discovery. I mean, by your theory, nothing that happened after the date the NDA was signed, which seems to be 2-11-11, is pertinent. Nothing after that date would be enforceable. There may have been separate oral agreements that the parties entered into, or the parties may have some implied agreements. And you were just gifting them these commissions, I guess, for that year. Not necessarily, no. They may have been being paid pursuant to oral agreements, or they may have been being paid pursuant to implied agreements, but those were separate, standalone agreements, not the NDA. And the only thing that GNS has ever attempted to enforce here in this case is the NDA. Separate and standalone in the sense that there were continuing obligations to pay for extensions and renewals? No. Where do those come from? That obligation comes from paragraph 12 of the NDA, correct? The continued payments after that July 2015 termination were not made pursuant to the NDA. They were made because Mark Blanton continued to bring in jobs, and again, those are implied agreements, those are purchase orders that are being solicited, and R3 did continue to pay commissions to GNS for that. Where in the record does it say, we are not making this payment pursuant to the now terminated NDA? Did you actually say that, or are you drawing an inference from something? Well, the NDA was terminated, and so I'm drawing an inference from it. Yeah, but the language of the NDA, paid for any and all extensions, renewals, et cetera, I mean, it's very common for agreements, and indeed the termination clause says, notwithstanding such termination, the obligations of each party is set forth in sections 2, 3, 4, and 12, 12 being this one, of this agreement shall survive termination of this agreement. So there's a survival clause that covers the extensions and renewals. And the extensions in that termination provision specifically notes sections 2, 3, 4, and 12, 12 being the commission, but with respect to the other two there, 3, 4, 12, the obligations that are set forth within there, that also required that GNS obtain jobs, it required it taken through the- Well, I'm not following you. The termination provision in part 13, I'm not sure these paragraphs are what they are, paragraph 13, says that the obligations in section 12 for the extensions shall survive termination. I'll give you another example of something that typically survives termination, and that's an agreement to arbitrate. It's not at all uncommon for contracts to end, but to provide for some continuing obligation. With respect to that paragraph 12, that would include obligations beyond just what's in 12.2. 12.1 required GNS to assist in starting up new jobs. It had continuing obligations, and the termination provision is clear that those obligations, as set forth in that paragraph 12, would survive termination of the agreement. After that date where R3 terminated the NDA, Mark Glidden, on behalf of GNS, What about the noninterference obligation? GNS agrees not to interfere with any existing R3 jobs. So after the agreement's terminated, GNS is off the hook for that, in your view? Potentially, yes. Mr. Hike, let me- I think I understand the procedural arguments you're making, in essence on the theory that even if GNS had a viable, a theoretically viable claim, they boxed themselves in or painted themselves into a corner somehow by not asserting it clearly enough. Ships passing in the night is an apt metaphor for what we're seeing here procedurally. Substantively, in the course of the parties' transactions with each other, is there a fact or set of facts that you see as decisively showing that GNS's theory of an NDA supplemented by account-specific agreements is unsupportable? The NDA, in cases that you look at, you can look at Conwell, you can look at Campbell, you can look at the Sand Creek Country Club case. In those cases where you have subsequent oral agreements, Indiana law is clear that that doesn't save the original agreement. That's not my question. Okay. I'm asking whether there are facts in the party's relationship with each other over the five or six years in question that are inconsistent, conclusively inconsistent, so there's no need for a trial with GNS's theory. There were subsequent agreements, whether they be oral or whether that be implied by the party's conduct, and there are facts within the record that demonstrate that they were paying commission based upon those subsequent agreements, that at some point after the NDA, they did agree upon what a commission rate should be. But in your view, those are entirely independent of the NDA, right? Yes. So what fact shows they're independent? I understand that's your theory. They have their theory. I'm looking for a fact or set of facts that would differentiate between those two theories. Other than the fact that they happened at a later time and that they weren't entered into at the time the NDA was entered into and the NDA is illusory, those would be the facts. But were clearly contemplated by the NDA, Paragraph 12. Well, I think you could argue that because the NDA contemplated only that the parties would attempt to agree upon something in the future. Okay. Thank you. So there never was any existing jobs obligation either. If this was never an agreement, if the NDA didn't apply, there was never any agreement not to interfere with any existing R3 jobs either. No obligation to assist. It just is off. It's out. Potentially, yes. Okay. So you got this benefit without paying much for it, I guess. All right. Well, thank you very much. You have about two minutes and a little bit. Two minutes and 25 seconds, Mr. Duari. Thank you, Your Honor. And just briefly on the motion to amend. So the first time this became an issue about an allegation, and it wasn't even an allegation, but the position that the nondisclosure agreement is unenforceable was in the summary judgment. So once the court raised that and we filed our motion for leave to amend to fix what the court believed was a problem, and under the circumstance of this case, and especially under Rule 15.2 of the Federal Rules of Civil Procedure, leave to amend is to be freely given when justice so requires. So it's not a case where we were dilatory, that this was an issue that somebody brought up before. This was brought up the first time in the summary judgment motions. We acted promptly to address that. And by not allowing the amendment on an issue that came up at the very end of the case, which wouldn't have changed anything, no additional discovery. It wouldn't change the legal briefs you wrote. It would do that. But under the circumstances, what happened in terms of interest of justice, it allows the defendant, or I'm sorry, it allows our three composites in this case to get off with violation of the Indiana Sales Commission Act and get off without paying the commissions that they agreed to pay under the nondisclosure agreement. Happy to answer any other questions. I see none, so thank you very much. Thanks to both counsel. We will take this case under advisement.